Mitchell B. Greenberg, Esq. (SBN 114878)
mgreenberg@abbeylaw.com
**ABBEY, WEITZENBERG, WARREN & EMERY, P.C.**
100 Stony Point Road, Suite 200
Santa Rosa, CA 95401
Telephone: 707-542-5050
Facsimile: 707-542-2589

Attorneys for Secured Creditor and Plan Proponent,
POPPY BANK, fka First Community Bank

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

December 14, 2022

In re:

HANSABEN INVESTMENTS, LLC, a California Limited Liability Company,

Debtor in Possession.

Case No. 22-30258 (Lead) DM
Jointly Administered
Chapter 11

**POPPY BANK'S CREDITOR'S FIRST AMENDED CHAPTER 11 PLAN**

In re:

PRITHVI INVESTMENTS, LLC, a California Limited Liability Company,

Debtor.

CASE NO.: 22-30259

In re:

RUDRA INVESTMENTS, LLC,

Debtor and Debtor in Possession.

CASE NO.: 22-30275

*Hon. Dennis Montali*

☐ Affects All Three Debtors in Possession
☒ Affects Hansaben Investments, LLC Only
☐ Affects Prithvi Investments, LLC Only
☐ Affects Rudra Investments, LLC Only

## INTRODUCTION AND PRELIMINARY STATEMENT

Poppy Bank, the largest creditor of the Debtor, Hansaben Investments, LLC ("Debtor"), proposes this Creditor's Chapter 11 Plan ("Plan") pursuant to the provisions of Chapter 11 of the Bankruptcy Code.

This Plan contains the Bank's proposal to satisfy certain Allowed Claims against the Debtor, including the Bank's. The Plan is both a liquidating Plan, providing for the orderly, prompt sale of the Debtor's sole asset, a sixty-room La Quinta Inn and Suites hotel and related amenities including furnishings, fixtures and equipment located at 316 Pitman Road, Fairfield, CA 94534 (collectively, the "**Hotel**"), and a "pot" plan providing for Pro Rata distributions to the holders of Allowed non-priority Unsecured Claims on the Effective Date of the Plan and for payment in full of Allowed Administrative Priority Claims. With the Plan, Creditors and other interested parties will receive the Disclosure Statement dated October 24, 2022 ("**Disclosure Statement**") that provides information concerning the Plan and the Debtor. The Disclosure Statement, prepared by the Bank, includes a summary of the Debtor's assets and liabilities, a summary of what the holders of Allowed Claims will receive under the Plan, a discussion of certain alternatives to the Plan, and a summary of the procedures necessary for approval, or for Confirmation of the Plan, and will satisfy the requirements contained in Bankruptcy Code section 1125 to provide "adequate information" to enable Creditors who are entitled to vote on the Plan to make an informed decision.

Whether the Plan is confirmed is subject to complex legal rules that cannot be fully described here. The Bank strongly encourages you to read carefully the Plan and Disclosure Statement that supports it and to consult an attorney to help you determine how to vote and whether to object to confirmation of the Plan.

If the Plan is confirmed, the payments promised in the Plan constitute new contractual obligations that replace the Debtor's pre-confirmation debts. Creditors may not seize their collateral or enforce their pre-confirmation debts if the obligations under this Plan are performed. The effects of a Plan default as well as confirmation of the Plan are described below.

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

The Bank hereby requests that the Bankruptcy Court confirm the Plan and do so, if applicable, in accordance with the provisions of Section 1129(b) of the Bankruptcy Code.

# ARTICLE I

# DEFINITIONS

As used in this Plan, the following terms have the meanings below:

"**Affiliate**" shall have the meaning ascribed to it in Bankruptcy Code section 101(2).

"**Administrative Claim**" means a Claim for any cost or expense of administration of a kind specified in Section 503(b) of the Bankruptcy Code, including any actual and necessary costs and expenses of preserving the Estate incurred on or after the Petition Date and through and including the Confirmation Date, fees due to the United States Trustee pursuant to 28 U.S.C. Section 1930(a)(6), and compensation for legal or other services and reimbursement of expenses allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code or otherwise.

"**Administrative Claims Bar Date**" means that date which is thirty (30) days following the Effective Date.

"**Allowed**" or "**Allowed Amount**" means the amount in which any Claim is allowed. Unless otherwise expressly required by the Bankruptcy Code, applicable non-bankruptcy law or the Plan, the Allowed Amount of any Claim does not include interest on Such Claim from or after the Petition Date.

"**Allowed Administrative Claim**" means all or any portion of an Administrative Claim that has either been Allowed by a Final Order or has not been objected to within the time period established by the Plan or by an order of the Bankruptcy Court.

"**Allowed Claim**", "**Allowed Priority Claim**", "**Allowed Secured Claim**", "**Allowed Tax Claim**", or "**Allowed Unsecured Claim**", means a Claim of the given type (a) in respect to which a proof of claim has be filed with the Bankruptcy Court by the applicable Claims Bar Date and to which no objection has been filed within the time fixed by the Plan or the Bankruptcy

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Court; (b) as to which no proof of claim has been filed and which has been listed on Schedule D, E or F of the Debtor's Schedules and is not listed as disputed, contingent, unliquidated, or unknown as to amount, and to which no objections has been filed within the time fixed by the Plan or the Bankruptcy Court; or (c) which is Allowed by a Final Order. No Claim shall be considered an Allowed Claim if (1) an objection to the allowance thereof is filed by a party-in-interest within the time fixed by the Plan or the Bankruptcy Court, and such objection has not been overruled by a Final Order, (2) the Claim has already been satisfied, or (3) the Claim is subject to operation of Bankruptcy Code Section 502(d).

"**Available Cash**" means all cash and cash equivalents owned or held in the Plan Disbursement Account available for payment of Allowed Claims and expenses incurred and anticipated to be incurred as provided under the Plan. Available Cash consists of cash and cash equivalents required to be turned over by the Debtor to the New Manager on the Effective Date, together with the Bank's separate contribution of $100,000, to be used to fund the $50,000 distribution to the holders of Allowed Unsecured Claims, and the $50,000 distribution to be made on the Effective Date to partially cure the Debtor's prepetition arrearages to its franchisor, La Quinta Franchising, LLC pursuant to Section 7.2 of the Plan to enable the Franchise Agreement to be assumed, and assigned.

"**Bankruptcy Case**" or "**Case**" means the bankruptcy case commenced by the Debtor filing its voluntary Chapter 11 petition with the Bankruptcy Court on May 25, 2022, case no. 22-30258 DM.

"**Bankruptcy Code**" means Title 11, United States Code, Section 101 et seq. as in effect and applicable to the Bankruptcy Case.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California, San Francisco Division.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure promulgated under 28 U.S.C. Section 2075, as amended, as applicable to the Bankruptcy Case.

"**Broker**" means Atlas Hospitality Group, including its real estate brokers and agents and other professionals, a real estate firm based in Orange County California that specializes in the

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

marketing and sales of hotels, to be appointed under the Plan to market and try to sell the Hotel.

"**Claim**" means any (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"**Claims Bar Date**" means (a) with respect to claims other than those held by governmental units, September 26, 2022, (b) with respect to claims held by governmental units, December 26, 2022, and (c) with respect to Rejection Claims, the Rejection Claims Bar Date.

"**Claims Objection Date**" means the date forty-five (45) days after the Effective Date; provided, however, that such date can be extended by the Bankruptcy Court for cause upon *ex parte* motion of the Bank.

"**Confirmation**" means the entry by the Bankruptcy Court of the Order of Confirmation.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Order of Confirmation.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court on confirmation of the Plan as required by Section 1128(a) of the Bankruptcy Code.

"**Creditor**" means any entity holding a Claim against the Debtor.

"**Disputed Claim**" means a Claim against the Debtor (a) as to which a proof of claim has not been filed and that has been listed in the Debtor's Schedules as disputed, contingent, unliquidated, or unknown as to amount; or (b) as to which an objection or adversary proceeding has been filed within any time fixed by the Bankruptcy Court or as to which an objection has been filed in accordance with the Bankruptcy Court's Guidelines for Valuing Collateral, and which objection or adversary proceeding has not been withdrawn or disposed of by a Final Order.

"**Distribution**" means, as the context requires: (a) the cash to be provided under the Plan to the holders of Allowed Claims; or (b) the payment, transfer, delivery or deposit of cash to

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050   Facsimile (707) 542-2589

Creditors pursuant to the Plan.

"**Distribution Date**" means any date on which a Distribution is made pursuant to the Plan.

"**Effective Date**" means the fifteenth (15th) day following the Confirmation Date so long as the Order of Confirmation is not subject to a stay.

"**Estate**" means the estate created by the commencement of the Bankruptcy Case and comprised of the property described in Section 541 of the Bankruptcy Code and all property and property interests of the Debtor acquired or arising after the Petition Date, including without limitation rents, issues and profits from operating the Hotel.

"**Final Order**" means an order entered on the docket by the Bankruptcy Court as to which no timely notice of appeal is pending within fourteen (14) days after entry of such order; or, if such appeal is pending, for which no stay pending appeal has been issued, and if there is any litigation related to any Claim outside the Bankruptcy Court, Final Order means the date on or after which no appeal or further appeal may be taken under applicable law.

"**Insider**" shall have the same meaning ascribed to it in Bankruptcy Code section 101(31).

"**Legal Rate**" means the federal judgment interest rate of 3.91% per annum.

"**Local Rules**" mean the Local Rules of the United States Bankruptcy Court for the Northern District of California, as amended, applicable to this Bankruptcy Case.

"**New Manager**" means, with respect to operations at the Hotel following Confirmation, Avalon Hospitality Group and Michael S. Goldstein, CHA/Perry Group International and Dennis P. Gemberling, CHA, CFBE, FMP, FCSI together with their agents, assigns and employees, who will be responsible for all operations at the Hotel pending the Sale Deadline and for the other functions described below.

"**Order of Confirmation**" or "**Confirmation Order**" means the order entered by the Bankruptcy Court approving and confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Code.

"**Person**" shall have the same meaning ascribed to it in Bankruptcy Code Section

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 6 of 42

101(41).

"**Petition Date**" means May 25, 2022, when the Debtor commenced this Bankruptcy Case.

"**Plan**" means this Plan, including any modifications or amendments that comply with Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

"**Plan Disbursement Account**" means the segregated, interest bearing account described in Section 5.3of the Plan utilized to pay Allowed Claims and expenses, to be maintained with the Bank, and includes all Available Cash.

"**Priority Claim**" means any Claim entitled to priority pursuant to Section 507(a) of the Bankruptcy Code, but not including an Administrative Claim or a Tax Claim.

"**Priority Claims Objection Date**" means the date thirty (30) days after the Effective Date.

"**Pro Rata**" means, with respect to any Distributions to be made to the holder of an Allowed Claim, the proportion that such Allowed Claim bears to the aggregate of all outstanding Allowed Claims in the same Class.

"**Rejection Claim**" means an Unsecured Claim arising from any rejection under the Plan or pursuant to an order of the Bankruptcy Court of an unexpired lease or executory contract.

"**Rejection Claims Bar Date**" means the earlier of (a) thirty (30) days following the date of the Effective Date, or (b) thirty (30) days after the rejection date with respect to an executory contract or unexpired lease rejected before the Confirmation Date pursuant to a Final Order.

"**Sale Deadline**" means five (5) months after the Effective Date which, unless extended by the Bankruptcy Court for cause pursuant to motion or application filed by the Bank or New Manager based on a pending *bona fide* sale escrow for the Hotel, shall serve as the final date for the Hotel to be sold pursuant to a closed escrow, or the Bank may complete a foreclosure sale on the liens it has against the Hotel at any point thereafter.

"**Sale Transaction**" means a closed sale, through escrow, of the Hotel following Bankruptcy Court approval in accordance with the procedures in Section 6.2, but does not include a completed foreclosure sale by the Bank.

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

"**Schedules**" means the Debtor's schedules of assets and liabilities consisting of Schedule "A" through "J" filed with the Bankruptcy Court pursuant to Section 521(a)(1) of the Bankruptcy Code and Bankruptcy Rule 1007(b), as may be amended at any time prior to Distribution.

"**Secured Claim**" means a Claim secured by a perfected lien, security interest or other charge against or interest in property in which the Debtor has an interest, i.e., the Hotel, to the extent of the value (as specified in the Plan, or if no value is specified, as determined in accordance with Section 506(b) of the Bankruptcy Code) of the interest of a holder of such Allowed Claim in the Debtor's interest in such property.

"**Tax Claim**" means any Claim against the Debtor entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code but does not include a Secured Claim for real property taxes.

"**Unsecured Claim**" means a Claim which is not a Secured Claim.

Other terms are defined in the first Section of this Plan, and below. A term used in the Plan that is not defined in its text, but which is defined in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or Rules.

## ARTICLE II

## DESIGNATION OF CLASSES OF CLAIMS AND INTERESTS

The Allowed Claims against and Interests in the Debtor are designated and classified below for purposes of the Plan. Except to the extent the Plan provides otherwise, a Claim or Interest that is properly includable in more than one class is classified in a particular class only to the extent that it qualifies within the description of that class, and is placed in a different class to the extent it qualifies within the description of that class.

2.1 **Class 1 (Secured Claim of Solano County Treasurer**). Class 1 consists of the Allowed Secured Claim of the Sonoma County Treasurer for unpaid real property taxes secured by the Hotel in the amount of $363,922.25 as of its September 26, 2022 proof of claim, plus interest and other charges accruing in accordance with applicable non-bankruptcy law.

2.2 **Class 2 (Secured Claim of Poppy Bank**). Class 2 consists of the Allowed Secured Claim of Poppy Bank secured by the Hotel, including the furniture, fixtures and

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

equipment, and cash revenues generated from operations, based upon its first-priority and second-priority liens against those assets in the aggregate amount of $7,440,347.25 as of the Petition Date based upon two secured loans the Bank provided to the Debtor on June 26, 2018. The amount of the Bank's Allowed Secured Claim includes post-petition interest, costs and fees as allowed by law, as well as any protective advances the Bank might make on account of the Class 1 creditor and/or the City of Fairfield, described below in Section 4.2, for the Debtor's unpaid transient occupancy taxes ("**TOT**"), and the $50,000 advance from the Bank to help cure the Debtor's prepetition arrearages under the Debtor's Franchise Agreement.

2.3 **Class 3 (General Unsecured Claims**) Class 3 consists of the Allowed Unsecured Claims against the Debtor, including without limitation all Rejection Claims, and includes the following Claims based upon the Schedules, and the proofs of claim that have been filed in the Bankruptcy Case: Wells Fargo Bank, Small Business Lending, $2,392.84 (from 6/29/22 proof of claim); Wells Fargo Bank, Small Business Lending, $14,621.72 (from 6/29/22 proof of claim); Golden Malted, $950.02 (from schedules); Dish Network, $669.08(from schedules); Wells Fargo Bank Elite Card, $1,520.03 (from Schedules); City of Fairfield, $1,436.96 (for utility services, not based on TOT, from Schedules); Telepacific Communications, $1,240.06 (from Schedules); Pacific Gas & Electric, $5,494.95 (from 6/24/22 proof of claim); Booking.com, $2,265.87 (from Schedules); HD Supply, Inc., $1,223.40 (from Schedules); Comcast, $924.07 (from Schedules); Republic Services, Inc., $897.58 (from Schedules); Ecolab, Inc., $330.43 (from Schedules); AT&T Corporation, $117.70 (from Schedules); Department of Treasury—Internal Revenue Service, $100 (from 8/16/22 amended proof of claim); TK Elevator Corporation, $5,550.38 (from 6/10/22 proof of claim); Franchise Tax Board, $7,194.10 (from 7/21/22 proof of claim—amount excludes separate Tax Claim afforded priority, and includes amount FTB states is secured ($6,060.10) because there is no value in junior lien against Hotel); B. Kapadia Insurance Agency, $38,984.26 (from 9/26/22 proof of claim); and United States Small Business Administration ("**SBA**"), $519,361.30 (from 9/28/22 amended proof of claim—claim is completely unsecured because there is no value in its junior lien against Debtor's personal property, the collateral pledged to secure the SBA loan).

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

2.4 **Class 4 (Equity Interests)**. Class 4 consists of Equity Interests in the Debtor owned by Hitesh Patel, Bhavesh Patel, and Reena Patel.

## ARTICLE III

## CLASSES OF CLAIMS NOT IMPAIRED UNDER THE PLAN

All classes of Claims are impaired under the Plan.

## ARTICLE IV

## TREATMENT OF UNCLASSIFIED CLAIMS

Unclassified Claims shall be treated as follows:

4.1 **Allowed Administrative Claims**. Except to the extent that the holder of a particular Administrative Claim has agreed to a different treatment of such Claim, each holder of an Allowed Administrative Claim shall be paid in cash, in full, upon the later of (a) the Effective Date, (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Administrative Claim, and (c) if such Claim is incurred after the Petition Date in the ordinary course of the Debtor's business by a person other than an insider or for a Tax Claim, within such time as payment is due pursuant to the terms giving rise to such Claim. Any request for allowance of an Administrative Claim pursuant to Section 503(a) of the Bankruptcy Code, including an estimation of expenses to be incurred after the Effective Date, and including the Debtor's professionals, must be filed on or before the Administrative Claims Bar Date or the holder of such Claim shall be forever barred from asserting such Claim or receiving any payment on account of such Claim. The Bank, if it succeeds in obtaining a Confirmation Order, intends to file for an Allowed Administrative Claim with respect to the reasonable and necessary fees and costs incurred in preparing and prosecuting the Disclosure Statement and Plan, for making a substantial contribution to the Estate, pursuant to Section 503(b) of the Bankruptcy Code.

4.2 **Tax Claims.** The holders of Allowed Claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code, specifically, the City of Fairfield for unpaid TOT , and the Franchise Tax Board for the priority portion of its Claim, will receive full payment of such Allowed Tax Claims as follows: such Claims will receive regular installment payments in cash, of a total value, as of the Effective Date of the Plan, equal to the Allowed Amount of such Claim,

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 10 of 42

quarterly, with the initial payment due 90 days following the Effective Date, for a period ending not later than 5 years after the Petition Date, as provided in Section 1129(a)(9) of the Bankruptcy Code, but subject to the following: Because, with respect to TOT, the City of Fairfield has stated in its proof of claim that several components are based on estimated revenues because the Debtor failed to report revenues from which the amount of TOT is calculated, the Bank, or any purchaser of the Hotel, reserves the right to object to the amount of TOT including in a contested matter before the Bankruptcy Court in the unlikely event the City of Fairfield will not work with the affected parties in good faith based on evidence to liquidate the amount of TOT. If there is a Sale Transaction, the Bank believes, based on application of applicable California law including California Revenue and Taxation Code section 7283.5, which provides among other things that any purchaser of property becomes personally liable for unpaid TOT in most circumstances, that the purchaser of the Hotel will assume, by operation of law, the obligation to pay the Debtor's unpaid TOT. Any payments made by such a purchaser will be credited, dollar-for-dollar, against the TOT priority Claim held by the City of Fairfield. If for any reason there is a Sale Transaction with a third party purchaser who does not discharge what amount to "successor liability" obligations for TOT and the Bank, pursuant to the Plan, pays the TOT Priority Tax Claim in full pursuant to this Section of the Plan, then, without further Order of the Bankruptcy Court, and promptly following the purchaser's default on statutory obligations to pay TOT, the Bank will become vested will all claims against the purchaser for reimbursement or recoupment or similar claims to the extent of the unpaid TOT under the Plan. The Bank reserves the right to pay Allowed Tax Claims in full at any time after the Effective Date, provided that all Claims entitled to higher priority pursuant to Bankruptcy Code Section 507(a) are first paid in full and provided further that any such payment will be part of the Bank's Class 2 Claim.

## ARTICLE V

## TREATMENT OF CLASSES OF CLAIMS AND INTERESTS THAT ARE IMPAIRED UNDER THE PLAN

The following classes of Claims and Interests are impaired under the Plan and shall receive the following treatment:

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

5.1 **Class 1 (Secured Claim of Solano County Treasurer)**. The holder of the Allowed Class 1 Claim shall retain its lien under non-bankruptcy law until all real property secured taxes have been paid in full. The Class 1 Claim will be paid in full on or before the Sale Deadline from escrow to sell the Hotel from the purchaser's proceeds through escrow. If there is no closed escrow for the sale of the Hotel and the Bank completes a foreclosure sale, the purchaser at that foreclosure sale, be it the Bank or a third party, will take title to the Hotel subject to the Class 1 Claim, which will be deemed all due and payable promptly after a trustee's deed upon sale is recorded, unless the holder of the Class 1 Claim agrees to a different payment arrangement. The Bank reserves the right to pay the Class 1 Claim on or before the Sale Deadline, and if it does so, the Bank's Allowed Secured Claim will include the amount of any sums it pays or advances to or on behalf of the Class 1 Creditor. Pending the Sale Deadline, the Class 1 Creditor will receive payment on the first installment of taxes due in calendar year 2023, from operating revenues and or from the Bank, if the deadline to make such first installment falls due prior to the Sale Deadline. If any required payment to the Class 1 Creditor is not timely made, then the Class 1 Creditor shall provide ten (10) days' written notice and opportunity to cure to the Bank and to the New Manager. If there is no timely cure of any such default, the Class 1 Creditor may enforce the entire amount of its Allowed Secured Claim in accordance with applicable state law and will be relieved from any stays by operation of law or under this Plan.

5.2 **Class 2 (Secured Claim of Poppy Bank).** The holder of the Allowed Class 2 Claim shall retain its liens under non-bankruptcy law until its Allowed Secured Claim has been paid, either through a closed escrow sale of the Hotel, including a successful credit bid as an overbidder at a sale approved by the Bankruptcy Court as described below in Section 6.2, or via a foreclosure sale absent a closed escrow on or before the Sale Deadline. Pending the Sale Deadline, the New Manager shall pay to the Bank monthly any net revenues generated from operating the Hotel, up to $36,000 per month, i.e., the monthly payment due the Bank under the Loan Documents at a non-default rate of interest, after paying or reserving for payment normal operating expenses including post-Effective Date real property taxes, TOT, franchise fees under the assumed Franchise Agreement, and the New Manager's fee. If the New Manager or Broker

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

presents a sale to the Bankruptcy Court that will not pay in full the Bank's lien, including accruing interest, costs and fees after the Petition Date, the Bank reserves the right to object to such a sale, and/or to make a credit bid up to the full amount of its Allowed Secured Claim. If the Bankruptcy Court and the Bank approve a "short sale" of the Hotel relative to the then-amount of its Allowed Secured Claim and the sale closes, the Bank waives any right to assert against the Debtor or its Estate a claim for a deficiency, but it does not waive any right to assert such a claim against any non-debtor third party, such as a guarantor of its loans to the Debtor, and it does not waive its right to be paid any Available Cash, i.e., its cash collateral. Pending the Sale Deadline, the Bank may not complete a foreclosure sale under its liens against the Hotel, or otherwise take possession of any of its collateral.

5.3 **Class 3 (Allowed Unsecured Claims)**. Each holder of Allowed Unsecured Claims shall receive Pro Rata distributions from Available Cash in the Plan Distribution Account as follows: The Bank will fund into the Plan Distribution Account the sum of $50,000.00 and will distribute such amount on the Effective Date Pro Rata to the holders of Allowed Unsecured Claims. If the Hotel is sold on or before the Sale Deadline and there are surplus proceeds from such a sale after payment of the Allowed Secured Claims and any unpaid Administrative Claims and costs of sale ("**Surplus**"), the Surplus shall be paid to the Plan Distribution Account and shall then be distributed promptly thereafter to the holders of Allowed Unsecured Claims, Pro Rata, up to and including the full amount of such Claims including interest at the Legal Rate.

5.4 **Class 4 (Equity Interests)**. All Equity Interests in the Debtor listed in the Debtor's Schedules and owned by Hitesh Patel, Bhavesh Patel and Reena Patel shall remain, however, there shall be no distributions made to the holders thereof.

## ARTICLE VI

## MEANS FOR IMPLEMENTATION OF THE PLAN

6.1 **Post-Confirmation Operations and Management of the Hotel**. From and after the Effective Date, New Manager will take over management of all aspects of operating the Hotel and shall operate the Hotel in a commercially reasonable fashion and pursuant to all

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 13 of 42

applicable laws and agreements that affect the Hotel, including the Franchise Agreement. The Debtor shall transfer to New Manager all accrued cash which will be used, except as otherwise provided in the Plan, to make Plan payments and to cover the Hotel's operating expenses, and the Debtor shall cooperate with New Manager to provide New Manager with access to the Hotel's books and records including electronic records and passwords and data regarding reservations to ensure a smooth transition. New Manager may retain existing employees of the Debtor to assist in operating the Hotel but will not be obligated to do so. New Manager may hire new employees or contractors to assist in operating and maintaining the Hotel. New Manager will have broad discretion to perform the other functions described in the proposed management agreement ("**New Management Agreement**") attached as Exhibit 1, including to make the payments contemplated thereunder and in this Plan. New Manager shall cooperate with the Broker to try to maximize the value of the Hotel. New Manager, without Bankruptcy Court approval, may borrow funds on a secured basis from the Bank or from a third party to the extent necessary or desirable to properly run the Hotel if there are insufficient operating revenues to address a condition, for example and without limitation, material repairs or replacement of broken or dilapidated items. Any such loans from the Bank to New Manager will be added to its Allowed Secured Claim. Such borrowing shall not exceed $25,000 absent Bankruptcy Court approval, which may be sought on an *ex parte* basis. New Manager will not be required to post a bond unless the Bankruptcy Court requires a bond or undertaking. New Manager shall sign necessary and desirable agreements to consummate the Sale Transaction described below in Section 6.2 and take such other steps as are necessary and desirable to close a sale of the Hotel in accordance with the Plan including to hire counsel to assist with a Sale Transaction or any matter requiring the advice of counsel in the reasonable discretion of New Manager that relate to the Plan, to be paid as an operating expense or from escrow to close a Sale Transaction. Pursuant to the Plan, New Manager is authorized to do all things necessary to run the Hotel and to consummate a Sale Transaction and otherwise perform the functions assigned to New Manager under the Plan.

6.2 **Sale Transaction**. This Plan is at bottom a liquidating Plan. Accordingly, the

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 14 of 42

Broker shall market for sale the Hotel in accordance with best practices applicable to similar assets to the Hotel in an immediate fashion. The Broker shall use best efforts to enable New Manager to enter into an agreement to sell the Hotel for the best price possible. The Broker shall communicate any offers to New Manager, the Bank, the Debtor, the SBA, the Franchisor and the United States Trustee and shall solicit their feedback how to respond to such offers, i.e., acceptance, rejection or counteroffer. New Manager will be the party responsible to direct the Broker how to respond to such offers. New Manager following consultation with parties-in-interest and the Broker may execute documents to try to complete a sale of any accepted offer ("**Conditional Hotel Purchase Offer**"). The Conditional Hotel Purchase Offer will be subject to overbids including a credit bid from the Bank as follows: Following an accepted Conditional Hotel Purchase Offer, the Broker shall provide written notice thereof to qualified third parties whom it believes may be interested in providing a competing offer, as well as to New Manager, the Bank, the Debtor, the Franchisor, and the SBA. That written notice shall set an out-of-court auction date and time, to be set by the Broker on no less than ten (10) days' written notice and conducted remotely by Zoom or a similar service, and provide interested parties with the terms of the accepted Conditional Hotel Purchase Offer. Any party wishing to make an overbid, including the Bank via credit bid, shall do so in increments of $25,000, or more, above the last accepted offer. All overbids shall match the principal terms of the accepted Conditional Hotel Purchase Offer. All offers including any overbid must be for cash and require no seller financing. Promptly following the completion of the foregoing auction, the Bank or New Manager shall file a motion with the Bankruptcy Court on at least seven (7) days' notice seeking approval of the winning Conditional Hotel Sale Offer, and any back up offers if for any reason the winning bidder fails to close, and authority to take all steps necessary or desirable to close such a sale on or before the Sale Deadline ("**Sale Transaction**"). Parties-in-interest reserve their right to object to a Sale Transaction at such a hearing on an approval motion. If there is an escrow opened to close a sale of the Hotel which cannot close on or before the Sale Deadline, the Bank and any other interested party may seek to extend the Sale Deadline for good cause by *ex parte* motion made prior to expiration of the Sale Deadline, with interested parties reserving their

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 15 of 42

right to object thereto. To the maximum extent provided by law pursuant to the provisions of Bankruptcy Code Sections 1123(a)(5)(D) and 363(f), any such Sale Transaction will be free and clear of liens and interests, with liens attaching to sale proceeds in the priority of perfection, and simultaneously with the closing of the subject Sale Transaction, any affected lien, interest or Claim shall be deemed discharged from the Hotel including without limitation, the real property, and the incorporated furniture, fixtures and equipment. If there are any tax consequences from any gain on a sale of the Hotel, liability therefor shall be borne by the Debtor and or its members, and not by the Bank or the Estate or any other party. If, on or before the Sale Deadline, there is no closed or accepted Conditional Hotel Sale Offer, then the Bank will be free to enforce its state law remedies, including to complete a unified or other foreclosure sale under its deed or deeds of trust and other security instruments against the Hotel promptly after the Sale Deadline. If there is a closed Sale Transaction or a foreclosure sale that does not result in full payment of the Bank's Class 2 Claim, New Manager shall deliver to the Bank any remaining Available Cash promptly following completion of such a Sale Transaction or foreclosure sale.

6.3 **Exemption from Documentary Transfer Tax.** The Sale Transaction shall be exempt from all documentary transfer taxes and other stamp taxes described in Bankruptcy Code Section 1146(b) to the maximum extent described therein. The Bankruptcy Court shall reserve jurisdiction under Bankruptcy Code Section 1146(b) to determine whether documentary transfer taxes otherwise arising out of the sale transaction are so exempt. If any such documentary transfer taxes must be paid prior to such determination to close a sale transaction, any such payment shall be deemed to be with a full reservation of rights and without prejudice to pursue a refund.

6.4 **Insurance Policies**. To the extent any insurance policies exist in which either the Debtor and/or its personnel have an insurable or other interest in or right to make a claim, such policies shall remain available, before and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Debtor, New Manager, and/or the Debtor's current or former management or other personnel that may be covered by such policies. New Manager will be responsible for obtaining such policy or policies of insurance to cover general liability and

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 16 of 42

property loss of or to the Hotel during its tenure and may pay therefor from the Hotel operating revenues with the Bank named as an additional insured and loss payee for property insurance coverage.

6.5 **Avoidance Actions and Other Litigation.** The Estate has disclosed no such claims or causes of action in its Schedules. The Bank believes that the Estate may have causes of action to recover Insider loans made to Affiliates. Such unasserted and unscheduled claims for relief or causes of action shall be abandoned to the Debtor upon entry of a Final Decree.

6.6 **Further Orders**. The Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to facilitate consummation or interpretation of the Plan following a duly filed request therefor by a party in interest.

6.7 **Post-Confirmation Fees**. Not later than thirty (30) days after the end of each calendar quarter that ends after the Effective Date (including any fraction thereof), New Manager shall pay to the United States Trustee the quarterly fee for such quarter until this case is converted, dismissed, or closed pursuant to a Final Decree, as required by 28 U.S.C. Section 1930(a)(6).

6.8 **Post-Confirmation Reports**. Not later than thirty (30) days after the end of the calendar quarter which ends after the Effective Date, New Manager shall file and serve upon the United States Trustee separate quarterly post-Confirmation status reports in substantially the form provided by the United States Trustee. Further reports shall be filed thirty (30) days after the end of every calendar quarter thereafter until entry of a Final Decree, unless otherwise ordered by the Bankruptcy Court.

6.9 **Final Decree**. Once the Plan is substantially consummated, New Manager, or the Bank, shall file an application for a Final Decree as provided in the Local Rules.

## ARTICLE VII

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1 **Assumption, Assignment and Rejection of Executory Contracts**. The following executory contract shall be assumed as of the Effective Date: The Debtor's franchise or license agreement with La Quinta Franchising, LLC (respectively, "**Franchisor**" and

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 17 of 42

"**Franchise Agreement**"). All other executory contracts and leases, whether described in Schedule G or otherwise, shall be deemed rejected as of the Effective Date.

7.2 **Cure of Defaults Under Franchise Agreement**. Promptly following the Effective Date, the Bank, in order to assist in providing a prompt cure of the Debtor's defaults under the Franchise Agreement, totaling approximately $188,813.85, shall pay to the Franchisor the sum of $50,000. Thereafter, the balance of any cure amount due the Franchisor in accordance with the provisions of Bankruptcy Code Section shall be paid from escrow to close the Sale Transaction, or by the Bank or a third party purchaser at any foreclosure sale promptly after the Bank completes a foreclosure sale if there is no timely closed Sale Transaction prior to the Sale Deadline. The Franchisor will be deemed to consent to the assignment of the Franchise Agreement if there is a closed Sale Transaction or if the Bank, or its nominee, takes title at a foreclosure sale absent a closed Sale Transaction.

7.3 **Rejection Claims**. Rejection Claims shall be classified as Class 3 Claims. The holder of a Rejection Claim shall file with the Bankruptcy Court a proof of claim relative to such Rejection Claim on or before the Rejection Claims Bar Date or be forever barred from asserting any such Claim or receiving any payment or other Distribution on account of such Claim.

## ARTICLE VIII

## PROOFS OF CLAIM; OBJECTIONS

8.1 **Claim Objections**. Any objection to a Priority Claim shall be filed no later than the Priority Claims Objection Date. An objection to any other Claim shall be filed no later than the Claims Objection Date. Any party in interest with standing under the Bankruptcy Code may file objections if there is a basis to do so.

8.2 **Distributions**. Notwithstanding any provision of the Plan specifying a date or time for payments or Distributions of consideration hereunder, payments and Distributions in respect of any Claim that at such date or time is disputed, unliquidated or contingent, shall not be made until a Final Order with respect to an objection, estimation or valuation of such Claim is entered by the Bankruptcy Court, whereupon appropriate Distributions shall be made promptly.

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 18 of 42

## ARTICLE IX

## RETENTION OF JURISDICTION

The Bankruptcy Court shall retain exclusive jurisdiction of the Bankruptcy Case (a) to enforce the provisions, purposes, and intent of the Plan, (b) to hear and determine any adversary proceedings or contested matters filed in or related to the Bankruptcy Case, (c) to hear and determine the allowance or disallowance of Claims, (d) to fix and approve allowance of compensation and other Administrative Claims, including if appropriate, payments to be made in connection with the Plan, (e) to adjudicate controversies arising from the terms of the Plan, (f) to hear and determine any proposed modifications or amendments to the Plan to the extent permitted by Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, (g) to enforce or interpret the provisions of the Plan, the Order of Confirmation, or any order entered by the Bankruptcy Court in the Bankruptcy Case, (h) to facilitate the consummation of the Plan, including without limitation the approval of any settlement, (i) to enter a separate order authorizing the sale of the Hotel free and clear of liens and interests, including to value at zero any asserted secured claims by the SBA or the Franchise Tax Board or any other party, (j) to consider such matters as may be set forth in the Plan or the Confirmation Order, (k) to hear and determine any Claim of any Person of any nature against the Bank or New Manager or Broker related to the Plan and the Bankruptcy Case, and (l) to enter a Final Decree to close the Bankruptcy Case. If closed, the Bankruptcy Case may be reopened at any time to facilitate the provisions of this Article.

## ARTICLE X

## DEFAULTS AND REMEDIES

10.1 **Material Default**. If any party defaults in obligations under this Plan by failing to make any required payment or do any act required hereunder, any Person affected by the default may serve written notice on the Bank, New Manager and the Debtor and the United States Trustee. If the alleged default is not cured within thirty (30) days following such notice,

Abbey, Weitzenberg, Warren & Emery P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 19 of 42

unless the defaulting party obtains an order from the Bankruptcy Court that no such default has been committed, then there will be a Material Default under the Plan as to all members of the affected class.

10.2 **Remedies Upon a Material Default**. Upon a Material Default, any member of a class affected by the default may file and serve a motion to dismiss or convert the Bankruptcy Case to Chapter 7, or, without further court order, has relief from stay, to the extent necessary, and may pursue lawful remedies under applicable non-bankruptcy law.

10.3 **Effect of Conversion to Chapter 7**. If the Bankruptcy Case is converted to Chapter 7, property of the Debtor shall vest in the Chapter 7 bankruptcy estate to the same extent provided in Section 348(f) of the Bankruptcy Code upon the conversion of a case from Chapter 13 to Chapter 7.

## ARTICLE XI

## EFFECT OF ORDER OF CONFIRMATION

As of the Effective Date, the effect of the Order of Confirmation shall be as follows:

11.1 **Binding Effect of Plan.** The provisions of the confirmed Plan shall bind the Debtor, the Estate, any entity acquiring property under or otherwise accepting the benefits of the Plan, every Creditor, and every Interest holder, whether or not such entity or Person has filed a proof of claim or interest, in the Bankruptcy Case, whether or not the Claim or interest is impaired under the Plan, and whether or not such Creditor or entity or Person has accepted or rejected the Plan. On the Effective Date, all property of the Estate will vest in the Debtor pursuant to Section 1141(b) of the Bankruptcy Code free and clear of claims and interests except as provided in this Plan, subject to revesting upon any conversion to Chapter 7.

11.2 **Full Satisfaction of Claims**. Except as otherwise provided in the Plan or Order of Confirmation, the rights afforded in the Plan shall constitute full and complete satisfaction and release of all Claims, including any interest accruing thereon from and after the Petition Date, against the Bank, Debtor, Estate, New Manager, Broker, or any assets or property of the Debtor or the Estate. Except for Administrative Claims, Rejection Claims, and Claims described in

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 20 of 42

Bankruptcy Rule 3002(c)(3), the Confirmation Order shall be deemed to be a Final Order disallowing any Claim not filed as of the Effective Date. Nothing herein shall exonerate any guaranty by a third party of a Claim.

11.3 **Injunction**. From and after the Effective Date, except as otherwise provided herein or in the Confirmation Order, all Persons who have held, currently hold or may hold a debt, Claim or Interest against the Estate, the Bank, New Manager, or their professionals, or their respective property, including property transferred pursuant to the Plan, are permanently enjoined from taking any of the following actions on account of such debt or Claim: (a) commencing or continuing in any manner any action or other proceeding against the Estate, the Bank, New Manager or their professionals, or their respective property, excluding only claims for willful misconduct or gross-negligence after the Effective Date; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or order against the Estate, the Bank, New Manager or their professionals; (c) creating, perfecting, or enforcing any lien or encumbrance against the Estate, the Bank, New Manager, or their professionals or their respective property, including property transferred pursuant to this Plan; (d) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Estate or the Debtor; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

11.4 **Limitation of Liability**. On and after the Effective Date, neither the Bank nor the New Manager nor any of their agents, employees, or professionals, shall have or incur any liability to any Person for any authorized action taken or authorized omission made in good faith in connection with or related to the Bankruptcy Case or the Estate, including objections to or estimations of Claims, disposition of assets, or formulating, determining not to solicit acceptances or rejections to, or confirming the Plan, on a contract, instrument, release or other agreement or document created in connection with the Plan. Nothing herein shall be deemed to release any party from any claims for willful misconduct, breach of fiduciary duty, or gross negligence.

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 21 of 42

## ARTICLE XII

## MISCELLANEOUS

12.1 **Plan Interpretation**. Plan headings are for convenience and shall not limit or otherwise affect in any way the meaning or interpretation of the Plan. All references in the Plan to the singular shall be construed to include references to the plural and vice versa. All exhibits to the Plan are incorporated by reference. All references in the Plan to a Section or an Article shall mean the appropriately numbered Section or Article of the Plan. Whenever the Plan uses the term "including," such reference shall be deemed to mean "including, but not limited to."

12.2 **Modification**. The Bank may propose amendments to or modifications of the Plan under Section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 at any time prior to the conclusion of the Confirmation Hearing. After the Confirmation Date, the Bank may modify the Plan in accordance with Section 1127(b) of the Bankruptcy Code and Bankruptcy Rule 3019.

12.3 **Waiver**. After the Confirmation Date, except as otherwise specifically set forth herein, any term of the Plan may be waived only by the parties or entities entitled to the benefit of the term to be waived and then, only in a writing signed by the party giving the waiver.

12.4 **Severability**. If any provision of the Plan is determined to be unenforceable, the determination in no way will affect or limit enforceability and the operative effect of any other provision of the Plan.

12.5 **Reservation of Rights**. Neither the filing of the Plan nor any statement or provision contained in the Plan or in the Disclosure Statement, nor the taking by the Bank of any action with respect to the Plan, shall (a) be or deemed to be an admission against interest, and (b) until the Effective Date, be or be deemed to be a waiver of any rights the Bank may have against any other party except as provided herein, with all such rights specifically reserved. If the Plan is not confirmed or fails to become effective, neither the Plan nor the Disclosure Statement may be used or relied upon in any manner in any suit, action, proceeding, or controversy within or without this Bankruptcy Case, except with respect to Confirmation of the Plan, and in that event,

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 22 of 42

the Bank will be free to seek relief from stay to enforce its available rights and remedies, notwithstanding the filing of the Plan.

Dated: December 14, 2022

"PLAN PROPONENT"

POPPY BANK

By: /S/ Lisa Mills

Its: Vice President, Special Assets Manager

Dated: December 14, 2022

ABBEY, WEITZENBERG, WARREN AND EMERY

By: /S/ MITCHELL B. GREENBERG
Mitchell B. Greenberg, Esq.
Its Counsel

ABBEY, WEITZENBERG, WARREN & EMERY P.C.
100 Stony Point Road, Suite 200, Santa Rosa, CA 95401
Telephone: (707) 542-5050 Facsimile (707) 542-2589

# EXHIBIT 1

# Hotel
# Management Agreement

Between


**Poppy Bank**
438 First Street
Santa Rosa, CA 95401


and

**Avalon Hospitality Group, LLC,**
a California limited liability company
9555 Chesapeake Drive, Suite 202
San Diego, California 92123


January 3, 2023

Case: 22-30258     Doc# 122     Filed: 12/14/22     Entered: 12/14/22 13:28:36     Page 25 of 42

# Table of Contents

1. OPERATING RESPONSIBILITIES ..... 1
   - 1.1 Appointment of the Manager ..... 1
   - 1.2 The Manager's Authority; Services ..... 1
   - 1.3 Independent Contractor Relationship ..... 2
   - 1.4 Operating Expenses ..... 2
   - 1.5 Capital Expenditures ..... 2
   - 1.6 Employees ..... 2
   - 1.7 General Manager ..... 2
   - 1.8 Poppy's Representative ..... 3
   - 1.9 Accounting ..... 3
   - 1.10 Legal Services ..... 3
   - 1.11 Debts and Liabilities to Third Parties ..... 3
   - 1.12 Cooperation with Real Estate Broker ..... 3
   - 1.13 Required Plan Payments ..... 3
2. TERM ..... 3
3. COMPENSATION ..... 4
   - 3.1 Set-Up Fee ..... 4
   - 3.2 Management Fee ..... 4
   - 3.3 Accounting Fee ..... 5
   - 3.4 Payroll Administrative Fee ..... **Error! Bookmark not defined.**
   - 3.5 Third Party Fees. Third party fees are directly passed on to Poppy as Operating Expenses without any markup by Manager. ..... 5
   - 3.6 Payment of Management Expenses ..... 5
   - 3.7 Additional Services ..... 5
   - 3.8 Construction Related Services ..... 5
4. EMPLOYEES ..... 5
   - 4.1 Supervision ..... 5
   - 4.2 Compensation ..... 5
   - 4.3 Payroll Requirement ..... 6
   - 4.4 Post-Termination Employee Obligations ..... 6
5. BUDGET ..... 7
6. OPENING INVENTORIES AND OPERATING FUNDS ..... 7
7. BANKING ..... 7
8. BOOKS AND RECORDS ..... 8
   - 8.1 Books ..... 8
   - 8.2 Statements ..... 8
   - 8.3 Balance Sheet ..... 8
   - 8.4 Costs ..... 8
   - 8.5 Right of Entry ..... 8
9. INDEMNIFICATION AND INSURANCE. ..... 8
   - 9.1 Poppy's Indemnity ..... 8
   - 9.2 The Manager's Indemnity ..... 9
   - 9.3 Insurance ..... 9

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 26 of 42

10. EVENT OF DEFAULT; TERMINATION ..... 10
10.1 Events of Default ..... 10
10.2 Termination Notice Due to Event of Default ..... 11
10.3 Right of Termination Specific to Section 10.2 ..... 11
10.4 Obligations Upon Termination ..... 11
10.5 Force Majeure Events ..... 12
10.6 Receiverships, Bankruptcy ..... **Error! Bookmark not defined.**
10.7 Waiver of Rights ..... 12
11. ATTACHMENTS ..... 12
12. GENERAL PROVISIONS ..... 12

**EXHIBIT A INSURANCE** ..... 1

## HOTEL MANAGEMENT AGREEMENT

**THIS HOTEL MANAGEMENT AGREEMENT** (this "**Agreement**") is made and entered into as of January 3, 2023, by and between Poppy Bank, whose address is 438 First Street, Santa Rosa, CA 95401 (the "**Poppy**") and Avalon Hospitality Group, LLC, a California limited liability company, whose address is 9555 Chesapeake Drive, Suite 202, San Diego, California 92123 (the "**Manager**").

## RECITALS

A. Poppy is the first and second lien secured creditor and Chapter 11 plan proponent in a bankruptcy in which Debtor, Hansaben Investments, LLC is the owner of certain real property which is improved with a 60-room hotel located at 316 Pittman Road, Fairfield, California 94534 commonly known as the La Quinta Inn & Suites by Wyndham Fairfield– Napa Valley (the "**Hotel**"). Poppy has filed a Chapter 11 "creditor's plan" which provides for orderly management and sale of the Hotel. The effectiveness of this Agreement is conditioned on Bankruptcy Court approval of the Poppy Bank Chapter 11 creditor's plan ("**Plan**") by an unstayed final order of the Bankruptcy Court approving the Plan.

B. Poppy desires to obtain the Manager's expertise in the management and operation of the Hotel, by delegating to the Manager control and discretion in the operation, direction, management, supervision and maintenance of the Hotel, and the Manager desires to assume such control and discretion on the terms and conditions set forth in this Agreement, consistent with the terms of a confirmed bankruptcy Plan.

C. Manager has read and understands the bankruptcy Plan and its obligations, including, without limitation, to sign agreements if there is a Sale Transaction regarding sale of the Hotel.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises and covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Poppy and the Manager agree as follows:

### 1. OPERATING RESPONSIBILITIES.

**1.1 Appointment of the Manager**. Subject to the terms of this Agreement, and any confirmed bankruptcy plan, Poppy hereby appoints the Manager as its exclusive agent pursuant to the Plan for the operation, direction, management, supervision and maintenance of the Hotel and the Manager hereby accepts such appointment.

**1.2 The Manager's Authority; Services**.

1.2.1 **Authority**. The Manager shall have the authority and responsibility, together with reasonable discretion therefore, to operate, direct, manage, supervise, and maintain

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 28 of 42

the Hotel. Except for emergency repairs, the Manager shall obtain the prior written approval of Poppy before incurring any expenses not reflected in the Hotel Budget (defined below in Section 5) which in the aggregate would exceed $2,500.

1.2.2 **Services**. The Manager agrees it shall diligently and efficiently manage and operate the Hotel, in accordance with all laws and regulations, and in the same manner as is customary and usual in the operation of comparable facilities in the State in which the Hotel is located. Manager will work with the franchisor as Poppy's Plan representative to maximize brand initiatives and programs to benefit the Hotel. The Manager shall implement all operating systems and procedures, prepare an annual marketing plan, prepare the Hotel Budget, handle all accounting, and prepare the Monthly Reports (defined below in Section 8.2). Manager's services, include, but are not limited to, handling all daily accounting, forecasts, cash projections, and preparing the Monthly Reports; overseeing and directing all rate strategy and revenue management programs; launching and maintaining an aggressive direct sales program; setting up a facilities management program including preventative maintenance specific for the Hotel; negotiating and setting up vendor contracts and service agreements, implementing operating systems and procedures; implementing standard operating procedures for human resources, setting up accounting procedures in accordance with uniform systems of accounting for hotels; and preparing the Hotel Budget.

**1.3 Independent Contractor Relationship**. In the performance of its duties as the Manager of the Hotel, the Manager shall act solely as an independent contractor as Plan representative of Poppy. Nothing in this Agreement shall constitute or be construed to be or create a partnership, agency relationship, or joint venture between Poppy and the Manager or, if applicable, the Affiliate (defined below in Section 1.6.1).

**1.4 Operating Expenses**. All costs, claims, and expenses related to operating, directing, managing, supervising, and maintaining the Hotel are "**Operating Expenses**." All the actions taken by the Manager in the performance of its obligations under this Agreement shall be Operating Expenses.

**1.5 Capital Expenditures**. In addition to making expenditures as set forth in the Hotel Budget, but subject to the prior written approval of Poppy (not to be unreasonably withheld), the Manager may consummate as Plan agent for Poppy at Poppy's sole expense, contractual arrangements for capital expenditures that are beneficial to the Hotel. Should Poppy fund such capital expenditures, consistent with its rights under the Plan, Poppy reserves the right to add such funds to its allowed secured claim in the In re Hansaben Investments, LLC bankruptcy.

**1.6 Employees**. All of the employees required for the operation of the Hotel (collectively, the "**Employees**") will be employed by Packard Pacifica, Inc., a California corporation, an affiliate of the Manager (the "**Affiliate**"). For purposes of Sections 4, 9, 10, and 12, the term "Manager" shall include both the Manager and the Affiliate jointly and severally.

**1.7 General Manager**. The Poppy shall have the right to approve the selection of the General Manager of the Hotel (the "**General Manager**") within ten (10) days of notification of the Manager's selection, accompanied by a description of such person's experience and other

qualifications; provided, however, the Poppy's approval shall not be unreasonably withheld nor on any basis that constitutes a violation of any applicable employment laws.

**1.8** **Poppy's Representative**. The Manager acknowledges that Perry Group International Limited, a California corporation, 50 California Street, Suite 1500 San Francisco, California 94111 ("**PGI**") has been employed as Poppy's representative to observe and comment on the Manager's management of the Hotel. PGI shall have access to the Hotel's premises, accounting records and other operational functions within the Hotel, and may communicate with the Manager's corporate office, the Hotel's General Manager, and the Hotel's Vice President of Operations. The Manager acknowledges that it shall provide lodging for PGI at the Hotel, subject to availability at no cost to PGI, in connection with PGI's services. PGI shall be paid out of the Management Fee (defined below).

**1.9** **Accounting**. The Manager agrees to provide routine accounting and purchasing services for the Hotel as required in the ordinary course of business, and as required by any Plan confirmed by the bankruptcy court.

**1.10** **Legal Services**. The Manager shall have the right to hire legal counsel or institute legal proceedings, which the Manager believes are required for the operation of the Hotel and necessary under the circumstances, in the Manager's sole and absolute discretion. All such legal fees and costs shall be Operating Expenses.

**1.11** **Debts and Liabilities to Third Parties**. Except as otherwise provided in this Agreement, including without limitation the provisions of Section 9.2: (i) all debts and liabilities to third persons incurred by the Manager in the course of its operation and management of the Hotel in accordance with the provisions of this Agreement shall be the debts and liabilities of Poppy only; and (ii) the Manager shall not be liable for any such obligations by reason of its management supervision, direction and operation of the Hotel for Poppy. The Manager may so inform third parties with whom it deals on behalf of Poppy and may take any other reasonable steps to carry out the intent of this Section. Notwithstanding these provisions, the Manager acknowledges and agrees that to the extent there are funds readily available to the Manager from Hotel operations and/or from the turnover of funds to the Manager pursuant to the Plan, those funds shall be used to timely pay all such operating debts and liabilities.

1.12 **Cooperation with Real Estate Broker.** The Manager agrees to cooperate with any real estate broker confirmed by the bankruptcy court to market and sell the Hotel, including executing sales documentation to best maximize the value of the Hotel.

1.13 **Required Plan Payments**. The Manager agrees to make the required Plan payments to Creditors from the funds in the Plan Disbursement Account, pursuant to the terms of the Plan.

## 2. TERM.

The term of this Agreement (the "**Term**") shall commence on January 3, 2023, or the Managers actual assumption of operations of the Hotel, whichever is later, and shall continue

until the occurrence of any of these events: upon a bankruptcy court order, upon a sale or transfer of the Hotel, or upon 10 days-notice provided by the Poppy to Manager for any reason.

## 3. **COMPENSATION**.

**3.1 Set-Up Fee**. The Manager shall be paid a one-time, non-refundable fee of $7,500, paid at the commencement of this Agreement, to off-set the cost of setting up the Hotel's legal fees, administrative and permit fees, accounting systems and payroll records, and to implement on site operating systems. This fee is in addition to the Management Expenses (as defined below).

**3.2 Management Fee**. As compensation for the services to be rendered by the Manager as set forth in this Agreement, Poppy hereby agrees to pay to the Manager a monthly management fee (the "**Management Fee**") equal to the greater of $5,000.00 per month for the first six (6) months, and $4,000 per month thereafter (the "**Minimum Fee**"); or three percent (3%) of Gross Income (as defined below in Section 3.2.1) for the prior month. The Management Fee is to be paid on or before the 5th day following the expiration of the prior month. The Manager shall be paid out of the Operating Account (as defined below in Section 7) its Management Fee for the month immediately just ended. In the event that there are ever insufficient funds in the Operating Account for such payment, Poppy shall pay the Manager on demand. If operations of the Hotel do not generate sufficient cash to pay the Management Fee and other operating expenses, including the Payroll requirement described in Section 4.3, Poppy shall fund the Operating Account so that there are always sufficient funds to pay at least the Minimum Fee, and if applicable the Payroll Requirement as described in Section 4.3. The Manager shall charge Poppy interest at the rate of one and one-half (1-1/2%) percent per month on the unpaid balance of any sums not paid on or before the 5th day following the expiration of the prior month.

3.2.1 **"Gross Income"** means all revenues, sales, fees or income of any kind resulting from the operation of the Hotel and spaces over which the Manager has any direct or indirect responsibility including, but not limited to: (i) rental of rooms; (ii) rental and other payments from licensees and concessionaires and others occupying space or rendering services at the Hotel; (iii) food and beverage sales; (iv) rental of meeting and banquet rooms, including related sales of food and beverages; (v) proceeds of use and occupancy insurance or business interruption insurance (after deducting therefrom necessary expenses in connection with the adjustment or collection thereof); and (vi) any other form of income whatsoever from any source whatsoever which is attributable to the Hotel; but not including any of the following: (a) the proceeds of any financing or refinancing, (b) casualty or liability insurance proceeds, (c) condemnation proceeds, (d) gratuities or service charges paid to Employees, (e) proceeds received in settlement for loss, theft or damages to property, (f) excise, sales or use taxes or similar charges which are required by law to be collected directly from patrons or guests or as part of the sales price of any goods or services or displays and which must be remitted to governmental authorities, (g) credits or refunds to guests, or (h) receipts arising from the sale of furniture, fixtures and equipment no longer required for the operation of the Hotel.

**3.3** **Accounting Fee**. The Manager shall install the Manager's accounting and operating systems. The monthly fee for accounting services customary charged by the Manager (the "Accounting Fee") is N/A.

3.4 **Third Party Fees**. Third party fees are directly passed on to Poppy as Operating Expenses without any markup by Manager if there are insufficient funds in the Hotel Operating Account to time pay such third party fees.

**3.5** **Payment of Management Expenses**. Subject to the Hotel Budget, if any, Poppy also agrees that all expenses, including reasonable costs of transportation, room accommodation, food, beverages, and travel expenses for the Manager, incurred in performing services essential for the profitable operation of the Hotel, shall be for the account of Poppy (the "**Management Expenses**"). The Manager shall be entitled to pay such expenses directly from the Operating Account or reimburse itself from the Operating Account for any such expenses which are paid by the Manager from its own funds.

**3.6** **Additional Services**. Poppy agrees to pay the Manager, at the Manager's current billable rates, for Additional Services required by Poppy which are not inconsistent with the terms of the confirmed Plan. "**Additional Services**" include, but are not limited to, capital improvement coordination, legal research, court appearances, interrogatories, depositions, and other activities due to sale or potential sale or refinancing of the property, market research, feasibility studies, workouts, receiverships, lawsuits, and extra work resulting from other non-management related activities. The Manager's current schedule of rates is available upon request.

**3.7** **Construction Related Services**. For construction related services assigned to the Manager by Poppy, Poppy hereby agrees to pay the Manager a fee equal to six percent (6%) of the total hard and soft construction expenses for each project (the "**Construction Fee**"). The Construction Fee shall be paid concurrently with any fees disbursed or scheduled to be disbursed to any construction service provider. Poppy reserves the right to add such funds paid by it to its allowed secured claim in the In re Hansaben Investments, LLC bankruptcy.

## 4. EMPLOYEES.

**4.1** **Supervision**. Poppy shall not interfere with or give orders or instructions to the Employees but shall refer any questions or concerns regarding the Employees and/or the Hotel to the Manager or the General Manager.

**4.2** **Compensation**. The determination of compensation and benefits of all the Employees shall be the sole responsibility of the Manager. The salaries and benefits of the Employees and all payroll and other direct and indirect costs, claims, and expenses related to their employment, including, but not limited to, administrative and processing fees, and any paid time off, severance pay or similar post-employment benefits (collectively, "**PTO**") under the Manager's policies in effect from time to time, shall be Operating Expenses, and the sole responsibility of Poppy to pay if the Operating Account contains insufficient funds therefor during a given pay period.

.

**4.3 <u>Payroll Requirement</u>**. Poppy shall fund the Operating Account at all times with funds sufficient to pay the estimated total payroll for the Employees for at least one month (the "**<u>Payroll Requirement</u>**") following written notice from the Manager that the Manager projects that the Operating Account will not contain sufficient funds for PTO; provided, however, in the event accrued PTO exceeds one payroll, the Payroll Requirement shall be increased by such excess amount. After receiving a written request, in the event that Poppy fails to meet the Payroll Requirement, or fails to reimburse the Manager for expenses related to the Employees in accordance with this Agreement, the Manager may immediately transfer or terminate the employment of some or all of the Employees, or terminate this Agreement in accordance with Section 10. In the alternative, the Manager or Affiliate, in its sole and absolute discretion, may advance (individually and collectively, the "**<u>Payroll Advance</u>**") funds on behalf of Poppy to protect itself and fund payroll. Each Payroll Advance shall immediately accrue interest at the lesser of: (i) one and one-half percent (1.5%) of any Payroll Advance per month or (ii) the maximum amount permitted by applicable law. The Manager shall be paid the Payroll Advance plus all accrued interest immediately upon demand and if and when available out of the Operating Account.

**4.4 <u>Post-Termination Employee Obligations</u>**. Unless stated otherwise below, Poppy is, and after Termination (as defined below) of this Agreement shall be, solely responsible for all of the following (collectively, "**<u>Poppy Employee Obligations</u>**"):

4.4.1 **<u>Compensation and Benefits</u>**. Any and all Employee compensation and/or benefits, including, but not limited to, unpaid salaries, paid time off, sick leave, overtime, bonuses, fringe benefits, workers' compensation benefits, health benefits, retirement benefits, and/or any other insurance benefits required by law or owed under this Agreement.

4.4.2 **<u>Other Direct and Indirect Costs</u>**. Any direct or indirect costs and/or expenses related to the Employees employment at the Hotel, including, but not limited to, administrative and processing fees, and any and all other employment related obligations of Poppy as required under this Agreement or by state, federal, or local law, statute, ordinance, rule, or regulation.

4.4.3 **<u>Advance Notice of Termination/ WARN Act Notification</u>**. The Manager shall be responsible for giving notices, if any, required to be given to the Manager's employees under the *Worker Adjustment and Retraining Notification Act* (the "***<u>WARN Act</u>***") and/or similar state or local laws, in connection with the Termination of this Agreement. The reasonable costs to provide such notices shall be Operating Expenses. Notwithstanding the foregoing, in the event Poppy fails, for any reason, to provide Prior Written Notice (defined below) to the Manager of early termination of this Agreement or any sale of the Hotel by Poppy, Poppy shall be solely responsible for any cost, expense, obligation, claim or other liability arising out of or in connection with any breach or claimed breach under the *WARN Act* and/or similar state or local laws. "**<u>Prior Written Notice</u>**" shall be notice that provides sufficient time to enable the Manager to serve notice to its employees in compliance with the provisions of the *WARN Act* and/or similar state or local laws.

4.4.4 **Final Payroll**. In addition to being solely responsible for the payment of any and all payroll owing to the Employees, if the Operating Account is insufficient to do so, Poppy agrees to remit funds sufficient to pay at least two (2) employee payroll periods into the Operating Account in advance of any distribution of payroll checks. Poppy further agrees that the Manager shall not release any payroll checks without the Operating Account being so funded.

**5. BUDGET**.

The Manager shall prepare a budget setting forth estimated revenue and expenses for a period of time extending six (6) months beyond the date Manager assumes control of the Hotel (such budget estimates are herein called, the "**Hotel Budget**"). The Hotel Budget shall be prepared on an accrual basis. Upon receipt of the Hotel Budget, Poppy shall have the right for a period of thirty (30) days to make reasonable modifications and revisions thereto for incorporation by the Manager. Upon the expiration of such thirty (30) day period, the Manager agrees to finalize the Hotel Budget. The Manager will advise Poppy on emergency expenditures outside the scope of the Hotel Budget in a reasonable amount of time.

**6. OPENING INVENTORIES AND OPERATING FUNDS**.

Poppy further agrees to provide and maintain, at a minimum, funds in the Operating Account equal to the Minimum Fee. Poppy further agrees, at the commencement of this Agreement and thereafter, to provide and maintain funds in the Operating Account upon the request of the Manager (a "**Capital Request**"), in accordance with the Plan and Hotel Budget and all costs in excess thereof for the uninterrupted and efficient operation and maintenance of the Hotel. The Manager shall not be required to advance its funds for any such expenses, nor shall the Manager be required to incur any liability in connection therewith, unless Poppy shall have furnished the Manager with funds in advance necessary for the discharge thereof if the Operating Account contains insufficient funds for such a Capital Request. Should, for any reason, the Manager provide the necessary funds for the continued operation of the Hotel, Poppy will, at the request of the Manager, immediately reimburse the Manager plus interest at ten percent (10%) per annum. Notwithstanding anything else set forth in this Agreement, the Manager's obligations, duties, covenants, agreements, and responsibilities under this Agreement are subject to sufficient funds being available to the Manager. The Manager shall not be deemed to be in default of its obligations under this Agreement to the extent it is unable to perform any obligation due to a lack of available funds.

**7. BANKING**.

Poppy and the Manager shall set up a mutually acceptable system by which: (i) the Manager shall deposit the Hotel receipts (including the funds to be turned over to the Manager by Hansaben Investments, LLC pursuant to the Plan) into an approved bank account (the "**Operating Account**"); and (ii) the Manager shall have the authority to pay the Operating Expenses from the Operating Account of invoices contemplated under the Hotel Budget and, except for emergency repairs, not exceeding the amounts set forth therein. The Manager will be the sole signatory on all accounts.

## 8. **BOOKS AND RECORDS**.

**8.1** **Books**. The Manager shall keep customary books of account and such other records reflecting the result of operating the Hotel.

**8.2** **Statements**. The Manager shall deliver to Poppy, the Debtor and the Franchisor, within twenty (20) days after the end of each month, the following items (collectively, the "**Monthly Reports**"):

8.2.1 A balance sheet as of the last day of such month;

8.2.2 An income and expense statement for such month;

8.2.3 Detailed departmental income and expense statements for such month;

8.2.4 Cash flow forecast for the next thirty (30) days which shall identify and explain working capital requirements during such period anticipated by the Manager in excess of $100,000.00;

8.2.5 Such other monthly reports as Poppy may reasonably request and to which the Manager agrees; and

8.2.6 Star Data as supplied by Smith Travel Research.

**8.3** **Balance Sheet**. At Poppy's discretion and at Poppy's sole cost, after the end of each calendar year, the Manager will cause to be delivered to Poppy a balance sheet and related statement of profit and loss (including all supporting departmental schedules of revenues and expenses) reviewed, or audited, if available, by independent public accountants, chosen and retained by Poppy, showing the assets employed in the operation of the Hotel and the liabilities incurred in connection therewith, for the preceding year and as of calendar year end.

**8.4** **Costs**. All costs and expenses incurred in connection with the preparation of any statements, schedules, computations, and other reports shall be borne by Poppy.

**8.5** **Right of Entry**. Poppy, its accountants, attorneys, and agents, retain the right to enter upon any part of the Hotel at any time during the Term for the purpose of examining or inspecting the books and records of the Hotel or for any other purpose which Poppy, in its reasonable discretion, shall deem necessary or advisable, but the same shall be done with as little disruption as possible. Books and records of the Hotel shall be kept at the Manager's office. In all cases, proper identification must be given before inspection or review will be permitted.

## 9. **INDEMNIFICATION AND INSURANCE**.

**9.1** **Poppy's Indemnity**. Poppy hereby agrees that it shall protect, defend (with counsel reasonably satisfactory to the Manager), indemnify and hold harmless the Manager and the Affiliate and their respective members, managers, affiliates, subsidiaries, employees and agents from and against any and all claims, loss, cost, damage, liability and expense (including insurance deductibles, court costs and reasonable expert witness and attorneys' fees) of any kind

or character arising from or related to the management, operation, or maintenance of the Hotel, including without limitation, those arising from or related to: (i) Poppy's failure to perform its obligations under this Agreement; (ii) a lawsuit, a threatened lawsuit, administrative proceeding, mediation, arbitration, claim or other liability made by, or in any way relating to, any of the Employees and/or in any way relating to Employee Obligations; (iii) Poppy's negligent or willful act(s); (iv) the performance by the Manager of its obligations and duties hereunder in accordance with the terms hereof (or having performed its obligations and duties as the Manager) or arising out of anything else the Manager may do or refrain from doing for and on behalf of Poppy and/or (v) acts by any employee, agent, consultant or contractor of Poppy; provided, however, it being expressly understood that Poppy does not hereby agree to, and shall not, so indemnify the Manager from any such claim, loss, cost, damage, liability, or expense to the extent arising out of any gross negligence and/or willful misconduct by the Manager, or out of any action of the Manager taken outside the scope of its authority as provided in this Agreement. The foregoing indemnity by Poppy shall expressly extend to any liabilities, claims and costs of defense arising out of or resulting from failure or refusal of Poppy to authorize compliance with any law, rule, order, or determination of any governmental authority with respect to the Hotel. The provisions of this Section shall survive the expiration or termination of this Agreement for a period of two (2) years from said expiration or termination.

**9.2 The Manager's Indemnity**. Subject to 9.1, the Manager agrees to protect, defend (with counsel reasonably satisfactory to Poppy), indemnify and hold harmless Poppy and its members, managers, employees and agents from and against any and all loss, cost, damage, liability and expense (including court costs and reasonable expert and attorneys' fees) to the extent arising out of the Manager's gross negligence and/or willful misconduct; provided, however, it being expressly understood that the Manager does not hereby agree to, and shall not, so indemnify Poppy from any such claim, loss, cost, damage, liability, or expense to the extent arising out of any negligence and/or willful misconduct by Poppy or with respect to the acts of the Manager duly authorized and performed in accordance with the terms and provisions of this Agreement and/or Poppy's instructions. The provisions of this Section shall survive the expiration or Termination of this Agreement.

**9.3 Insurance**.

9.3.1 During the Term, the insurance listed on Exhibit A, which is attached hereto and incorporated herein, shall be maintained at Poppy's sole cost and expense only if there are insufficient funds in the Operating Account to pay for such insurance. Exhibit A shall be modified as directed in writing by Poppy or any lender under applicable loan documents to the Manager from time to time to comply with any and all insurance requirements set forth in such loan documents. Insurance required hereunder shall be in companies rated A, VII or better in "Best's Insurance Guide."

9.3.2 Subject to Section 9.3.1, Manager is responsible for having in place sufficient insurance to cover all risks associated with the Hotel. **The Manager requires: (i) certificates of insurance with respect to all of the policies of insurance so procured, including existing, additional and renewal policies; and (ii) in the case of insurance about to expire, certificates of insurance with respect to the renewal policies not less than ten (10) days prior to the respective dates of expiration.**

9.3.3 All policies of insurance covering loss or damage to the Hotel's improvements and contents, including furnishings and equipment, operating supplies and inventories, and all business interruption insurance shall be carried in the name of Poppy or the Manager, with the other party being added as a loss payee. All policies of insurance required under this Agreement shall name Poppy, the Manager, and their respective officers, agents, affiliates, subsidiaries, and employees as the insured parties. Notwithstanding the foregoing, if a mortgagee so requires, losses may be made payable to a mortgagee.

9.3.4 All policies of insurance provided for under this Section shall include: (i) an endorsement showing the Manager and its respective officers, agents and employees as an additional insured; (ii) an endorsement that such policy shall not be canceled or materially changed without at least thirty (30) days' prior written notice or ten (10) days of non-payment of premiums to Poppy or the Manager (as the case may be); (iii) an endorsement to the effect that no act or omission of Poppy or the Manager (as the case may be) shall affect the obligation of the insurer to pay the full amount of any loss sustained; and (iv) an endorsement to the effect that such insurance shall be primary to any similar insurance carried by Manager. All endorsements shall be delivered to the Manager.

9.3.5 Neither Poppy nor the Manager shall assert against the other, and each hereby waives and releases with respect to the other, any claims for any losses, damages, liability or expenses (including attorneys' fees and expenses) incurred or sustained by either of them on account of injury to persons or damage to property arising out of ownership, operation and maintenance of the Hotel, to the extent that the same are covered by insurance required under this Section.

9.3.6 All insurance policies shall provide, to the extent customarily obtainable from the insurance company providing such insurance, that the insurance company will have no right of subrogation against Poppy, the Manager, or any of their respective agents, employees, partners, members, officers, directors, affiliates, subsidiaries, or beneficial assigns.

9.3.7 The provisions of this Section shall survive the Termination of this Agreement with respect to acts, omissions and occurrences arising during the Term.

## 10. <u>EVENT OF DEFAULT; TERMINATION</u>.

**10.1 <u>Events of Default</u>**. The following shall constitute events of default (an "**<u>Event of Default</u>**"):

10.1.1 If either party shall be in default in the: (i) payment of any amount required under the terms of this Agreement on the date that such payment is due, whether to be paid to a party, or to the Operating Account to maintain required balances, including but not limited to, under Section 4 or a Capital Request under Section 6; or (ii) failure by Poppy to satisfy its obligations set forth in Sections 4, 6 and 9 of this Agreement, and such default continues for a period of ten (10) days after written notice from the Manager;

10.1.2 If either party shall be in material default in the performance of its other obligations under this Agreement, and such default continues for a period of thirty (30) days after written notice from the other party, provided that if such default cannot by its nature reasonably

be cured within such thirty (30) day period, an Event of Default shall not occur if and so long as the defaulting party promptly commences and diligently pursues the curing of such default;

10.1.3 If either party shall: (i) make an assignment for the benefit of creditors; (ii) institute any proceedings seeking relief under any federal or state bankruptcy or insolvency laws; (iii) institute any proceeding seeking the appointment of a receiver, trustee, custodian or similar official for its business or assets; or (iv) consent to the institution against it of any such proceeding by any other person or entity (an "**Involuntary Proceeding**"); provided, however, that the existing bankruptcy In re Hansaben Investments, LLC, action #22-30258 does not qualify as an Event of Default;

10.1.4 If an Involuntary Proceeding shall be commenced against the other party and is not dismissed within a period of ninety (90) days.

**10.2 Termination Notice Due to Event of Default**. If any Event of Default shall occur, the non-defaulting party may terminate this Agreement on five (5) days prior written notice to the defaulting party.

**10.3 Right of Termination Specific to Section 10.2**. The right of termination set forth in Section 10.2 shall not be in substitution for, but shall be in addition to, any and all rights and remedies for breach of contract available in law or at equity.

**10.4 Obligations Upon Termination**. Upon expiration or earlier termination of this Agreement ("**Termination**"), the following shall also be required:

10.4.1 **Transition**. Poppy shall have the right to retain Manager at its then current billable rates to cooperate with Poppy to affect an orderly transition of management functions from the Manager to the Poppy, any transferee of Poppy, or to any managing agent designated by tPoppy or transferee of Poppy for a period of up to sixty (60) days from the date of Termination. Any purchaser of the Hotel pursuant to the Plan is an intended third party beneficiary of this Section of the Agreement.

10.4.2 **Poppy Employee Obligations**. In the event any claim, including a claim covered by EPL insurance, has been filed against the Manager, whether during or after the Term, Poppy agrees to fund the Manager with the entire insurance deductible pertinent to such claim ("**Deductible**"). Any Deductible not used by the Manager will be returned to Poppy. Also see obligations set forth in Section 4.

10.4.3 **Payment of the Manager's Fees and Expenses**. In addition to any damages relating to a breach of this Agreement, in the event of Termination, Poppy shall pay the Manager any accrued but unpaid Management Fee and Incentive Fee, if any, that has been earned up to, and including the effective date of, the Termination. Poppy shall also pay the Manager all unpaid Management Expenses, and all actual out of pocket expenses arising as a result of such Termination, immediately on the receipt of any invoice (together with such reasonable supporting documentation as Poppy may request). If Poppy's default caused the Termination, then Poppy shall also pay the Manager an amount equal to the Management Fee that Manager would have received for the remainder of the Term had this Agreement not been terminated early.

10.4.4 **Payment of Fee On Sale of Hotel**. Notwithstanding anything herein to the contrary, if the Manager locates a bona fide third party who contracts to purchase the Hotel at a price that is acceptable to Poppy, and such sale is approved by the bankruptcy court and consummated, then this Agreement shall terminate upon completion of the sale and Poppy shall, in addition to any unpaid Management Fee and Management Expenses that have been earned up to and including the effective date of the Termination, also pay a fee to Manager equal to one percent (1%) of the purchase price.

10.4.5 **Tender of Defense Upon Termination**. At the Manager's option, upon Termination of this Agreement, Poppy shall assume the defense of any claim covered under Section 9.1. The defense shall be conducted by counsel selected by Poppy, subject to the reasonable approval of the Manager. Poppy shall have the right to settle such claim, without the consent of the Manager, provided that: (i) Poppy (or its insurer) pays all amounts due in connection with, or by reason of, such settlement; and (ii) the Manager is unconditionally released from all liability in respect of such claim.

**10.5 Force Majeure Events**. Neither party shall be deemed to be in default of its obligations under this Agreement if and to the extent that such party is unable to perform such obligation as a result of fire or other casualty, act of God, strike or other labor unrest, unavailability of materials, war, terrorist activity, epidemic, pandemic, riot or other civil commotion or any other cause beyond the control of such party (collectively, "**Force Majeure Events**"); provided however, this Section does not apply to a party's payment obligations under this Agreement.

**10.6 Waiver of Rights**. Each of the parties hereto irrevocably waives any right such party may have against the other party hereto at law, in equity or otherwise to any consequential damages, punitive damages or exemplary damages.

## 11. ATTACHMENTS.

All documents attached hereto or referenced expressly herein, including any appendices, schedules, riders, and exhibits to this Agreement, are hereby expressly incorporated by reference.

## 12. GENERAL PROVISIONS.

This Agreement shall be governed by and construed in accordance with the laws of the State of California, without reference to any conflict of law provisions thereof. All Recitals in this Agreement are incorporated herein as though set forth in full. The captions and headings of the sections and paragraphs of this Agreement are for convenience of reference only and shall not be construed in interpreting the provisions hereof. This Agreement may be amended at any time, but only by the written agreement of the parties. Each party irrevocably consents to the exclusive jurisdiction and venue of any federal or state court within San Diego County, California, in connection with any matter based upon or arising out of this Agreement or the matters contemplated in this Agreement, agrees that process may be served upon them in any manner authorized by the laws of the State of California for such persons, and waives and covenants not to assert or plead any objection that they might otherwise have to such jurisdiction, venue and such process. The covenants and agreements and any and all other terms and

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 39 of 42

provisions herein contained, express or implied, shall be only for the benefit of the parties hereto and their respective successors and assigns. This Agreement constitutes the entire agreement among the parties relating to the subject hereof and supersedes all prior understandings between the parties relating to the subject hereof, whether written or oral. No waiver of any rights or remedies by any party to this Agreement shall constitute a waiver of any future or other right or remedy by that party. If any provision of this Agreement shall be held to be invalid, void, or unenforceable, the remainder of this Agreement shall remain in full force and effect without being affected, impaired, or invalidated thereby. Time is of the essence in this Agreement. This Agreement may be signed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same instrument. Facsimile and email signatures shall be binding and enforceable in the same manner as an original signature. All notices, demands, requests, consents, approvals and other communications required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing and shall be sent by one of the following methods, in each case addressed to the party to be so notified at the address shown below: (i) personally served (including delivery by messenger); (ii) sent by registered or certified mail, postage prepaid, return receipt requested; (iii) sent by e-mail or facsimile followed by delivery of a hard copy by mail with postage prepaid; or (iv) sent by a nationally recognized overnight courier service. This Agreement shall accrue to the benefit of, and be binding upon the parties hereto, and their successors and assigns. All continuing covenants shall survive the expiration or sooner Termination of this Agreement. In the event of any litigation involving the parties to this Agreement to enforce any provision of this Agreement, to enforce any remedy available upon default under this Agreement or seeking a declaration of the rights of either party under this Agreement, the prevailing party shall be entitled to recover from the other such attorneys' fees and costs as may be reasonably incurred. Each party hereby agrees that it shall, upon request of the other, execute and deliver such further documents and perform such other acts and things as are reasonably necessary and appropriate to effectuate the terms and conditions of this Agreement, without cost. The Manager and Poppy each represent and warrant that the execution, delivery, and performance of this Agreement are within their authority and have been duly authorized by all necessary action. Each individual executing this Amendment on behalf of the Manager and Poppy is duly authorized to do so.

*[Signatures on Next Page]*

**IN WITNESS WHEREOF**, the parties have executed, or caused to be executed, this Agreement, as of the date first written above.

**POPPY**

Poppy Bank

By ______________________________
Lisa Mills, Member

By ______________________________
Carie Fletcher, Member

Address:

438 First Street

Santa Rosa, California 94501

Telephone: 707-636-9000

Email: lmills@poppy.bank

**MANAGER**

Avalon Hospitality Group, LLC,
a California limited liability company

By ____________________________
Michael S. Goldstein, President

Address:

9555 Chesapeake Drive, Suite 202

San Diego, California 92123

Telephone: 858-277-4305

Email: michael@packard-1.com

Case: 22-30258 Doc# 122 Filed: 12/14/22 Entered: 12/14/22 13:28:36 Page 41 of 42

# EXHIBIT A

# INSURANCE

A. Insurance covering the Hotel and all of its furniture, furnishings, and contents against loss and/or damage by fire and other risks now or hereafter embraced by extended coverage in an amount of not less than the full replacement cost (exclusive of the cost of excavations, foundations, and footings). Such full replacement cost shall be determined by written appraisal from time to time at the request of the Poppy or the Manager by an insurance rating organization, appraiser, engineer, architect, or contractor. The placement of property insurance will include business interruption coverage for a period of not less than twelve (12) months with an extended period of indemnity for one hundred and eighty (180) days. The Manager shall be added as a loss payee under such business interruption coverage.

B. Personal Injury and Property Damage Liability Insurance against claims for bodily injury, death or property damage, occurring on, in or about the Hotel, or the elevators, inside or outside, and on, in or about the adjoining streets, to afford minimum protection during the term of this Agreement of not less than Ten Million Dollars ($10,000,000.00) in respect of any one occurrence or accident, and of not less than Two Million Dollars ($2,000,000.00) for property damage per occurrence with that certain Additional Insured-Managers or Landlords Premises Endorsement and contain that certain Amendment of the Pollution Exclusion Endorsement for damage caused by heat, smoke, or fumes from a hostile fire. Such policy shall not contain any intra-insured exclusions as between insured persons or organizations.

C. Employment Practices Liability Insurance and Workers' Compensation Insurance covering all of the Manager's employees at the Hotel, to the extent available at commercially reasonable rates and terms, in an amount not less than One Million Dollars ($1,000,000.00).

D. Crime Coverage in the amount of Five Hundred Thousand Dollars ($500,000.00).

E. All insurance listed on this Exhibit A will, at a minimum, meet any and all obligations regarding liability limits and property limits as required by any loan documents or franchise documents applicable to the Hotel.